## J. W. CLINE v. THE STATE.

1. THEFT—SWINDLING.—To constitute the offense of *swindling*, the title to money or property must be obtained by the accused, or must pass from the injured party. Where the possession is obtained by false pretenses, or the taking be originally with intent to deprive the owner, the offense is *theft*.

2. IDENTIFICATION OF MONEY.—See testimony held insufficient to support a verdict of guilty of theft of money.

APPEAL from Grayson. Tried below before the Hon. Silas Hare, judge of the criminal court of Sherman.

Appellant, J. W. Cline, and one Wm. Hughes were indicted for theft of money from Samuel Dukes. The money is described in the opinion. Cline was tried, found guilty, and his punishment fixed at confinement in the penitentiary for two years and six months. His motion for new trial was overruled, and he appealed.

On the trial Samuel Dukes testified as follows:

"On the 27th October, 1874, at Dennison, Grayson county, Texas, I lost twenty dollars. J. W. Cline, one of the defendants, on that day came to me and told me he had a mule for sale. I told him I did not wish to buy, but I have a yoke of oxen I would trade for a mule. Cline replied, 'Come, and I will show it to you.' I went with him to an open place in the rear of a store, and went through the store to look at the mule. He said he (the mule) had been taken to water. Defendant Cline said, ' We will sit down here, and the mule will be back in a few moments.' He then drew out five business cards and said he believed[p] he would raffle off his mule. On the back of one of the cards was a dot on one corner. The other cards were unmarked, and on their backs resembled each other.

"Defendant Cline showed me how I could draw the card with a 100 on its face by the private mark on its back. About this time defendant Hughes came up at my back.

Hughes took the cards, looked at them, and said he would bet the drinks that no one could draw the card with the 100 on its face the first draw. Cline said, 'I will take the bet that this old man can draw it.' They bet the drinks; I drew and got the 100 card. Cline won and Hughes lost. Hughes then seemed to get very mad and said, 'I will bet from five to twenty dollars that he (witness) could not draw the card again.' Cline said, 'I have not got the money;' turning to me after feeling towards his pocket, 'if you have twenty dollars lend it to me.' I took out the money and counted it on my knee. The two defendants bet, and as I was drawing the card Hughes put down something that appeared like a twenty-dollar gold piece on the twenty dollars on my knee, and as the hand he had it in came down on my knee grabbed all the money and ran off with it. I drew the losing card, but did not take hold of it until Hughes had grabbed the money. The money taken consisted of three five dollar bills, two ones, one two, one fifty cent piece and two quarters. Cline said, 'You fool, why did you not draw the right card.' I then grabbed Cline and said, 'You are partners and swindlers;' that he had 'cheated me out of my money and should not go until I got my money back.' Cline then went into three or four different places with me, as if hunting Hughes; said he would find him and get the money back, if Hughes had not spent it. At last he led me into a large house where a woman and some men were playing cards. Cline walked to the middle of the floor, and while I was not watching very close, he jerked loose from me and darted through a side room door. I tried the door and found it fast. I then went and found a policeman, and when we got back to the house where I had last seen defendant we got them to open the side room door, but Cline was gone. We found out from the woman that the man I had brought there was named Cline, and I gave the policeman his description. We left the house and hunted some time for Cline. At

last the policeman told me to go one way through an alley and he would go another and we would catch him. In going through the alley I looked into an outhouse that had the window glass broken out, and by poking my head through the sash was able to see Cline sitting in one corner, 'hunkered down.' I called out to the policeman, 'Here he is,' when Cline said, 'No, I am not the man.' But I told him he was, and had him taken into custody. Cline was arrested on 'Skiddy street.' We arrested Hughes on Woodward street. When Hughes was arrested he had six dollars in his possession. I recognized one two-dollar bill and one one-dollar bill as mine. These two were returned to me. The two-dollar bill I had before the grand jury, and also showed it to Mr. Denton, a lawyer, who took a written description of it."

The officer making the arrest testified to finding six dollars on the defendant, Hughes, two of the bills, one two and one one-dollar bill being identified and claimed by Dukes.

The district attorney also testified that he had the two-dollar bill shown him by Dukes before him when he drew the indictment, and described it accurately at the time.

*G. G. Randell*, for appellant.

*A. J. Peeler, Assistant Attorney General*, for the State.

MOORE, ASSOCIATE JUSTICE.—The appellant, J. W. Cline, and Wm. Hughes are charged with the theft of " three currency notes of the United States of the denomination and value of five dollars each, two one-dollar currency notes of the United States of the value of one dollar each, one two-dollar currency note of the United States of the value of two dollars, one United States currency note of the denomination and value of fifty cents, and two United States fractional currency notes each of the value of twenty-five cents, of the aggregate value of twenty dol-

lars; said property being then and there the corporeal property of said Samuel Dukes."

It is quite evident from the facts disclosed in the record that there was a preconcerted scheme between the appellant, Cline, and said Hughes either to steal or swindle said Dukes out of his money. But whether the offense actually committed by them was theft or swindling depends upon the fact whether or not Dukes had actually parted with his property in the money alleged to have been stolen before its caption and asportation by Hughes. The line of separation between these offenses is in many cases uncertain, and can with difficulty be clearly traced. The effort to distinguish between them often presents an intricate question whose correct solution often depends upon nice distinctions and rules of law of a somewhat technical character.

As defined in article 745, Criminal Code, "theft is the fraudulent taking of corporeal personal property belonging to another from his possession, or from the possession of some person holding the same for him, without his consent, with intent to deprive the owner of the value of the same, and to appropriate it to the use and benefit of the person taking." And by article 748 it is further provided, "if the taking, though originally lawful, was obtained by any false pretense, or with intent to deprive the owner of the value thereof, and to appropriate the property to the use and benefit of the person taking, and the sum is so appropriated, the offense of theft is complete."

Article 773*a* of the same code reads: "Swindling is the acquisition of any personal or movable property, money, or instrument of writing conveying or securing a valuable right, by means of some false or deceitful pretense or device, or fraudulent representation, with intention to appropriate the same to the use of the party so acquiring it, or of destroying or impairing the rights of the party justly entitled to the same." And as this definition seems to be

quite broad enough to include some phases of the offense of theft, and possibly some other offenses, to avoid as far as possible any embarrassment in determining the particular offense for which the criminal should be held to answer, if the facts bring the case within the definition of swindling, as well as theft or some other offenses, it is further provided by article 773c: "Where property, money, or other articles of value enumerated in the definition of swindling are obtained in such manner as to come within the meaning of theft, or some other offenses known to the law, the rules herein prescribed with regard to swindling shall not be understood to take such case out of the operation of the law which defines such offenses."

It is quite obvious, however, that this article of the code in no way enlarges, or was intended to enlarge, the definition of the offense of theft, or any other offense. And unless the facts show this to be a case of theft as defined in the code the present indictment cannot be sustained. And this, as we have already said, depends upon the fact whether Dukes had parted with his property in the money by a completed loan of it to Cline, and had no claim upon the particular money, but was entitled to rely merely upon Cline for repayment of the amount so loaned. If so he had no property in the money when it was taken, and the indictment for theft cannot be maintained. But if, on the other hand, the supposed borrowing of the money was merely colorable, and a mere trick and device between Cline and Hughes to get Dukes to exhibit his money to enable them the more readily to clutch and carry it way without his consent; and if, when it was snatched by Hughes, the money was still in Dukes's possession, and there had been no complete and *bona fide* loan of it, unquestionably the parties taking it were guilty of and may be prosecuted for theft, although the offense committed may also come within the definition of swindling. (See 2 Bish. Cr. Law, secs. 816, 818; Archb., 2d. Ed., 372–4, notes.)

But, conceding that the facts warrant a prosecution for the offense charged in the indictment, we are of the opinion that the evidence exhibited in the statement of facts does not support the conviction for the theft of the particular currency notes described in the indictment of 'the aggregate value of twenty dollars. Only the two-dollar bill described in the indictment was identified by the evidence with any reasonable degree of certainty. This was the only one of the bills described in the indictment which was before the grand jury. It was examined by the district attorney, who testifies that it is correctly described in the indictment, and Dukes testifies that it was one of the bills taken from him by Hughes. The only identification of the other bills is the evidence of Dukes. He says: " I had the two-dollar note before the grand jury. I have spent the two-dollar bill since; I do not know whether it was a currency note, a bank note, or treasury note; I do not know the different kinds of money; I do not know whether it was good money or counterfeit; I took it as good, and believe it was good money; I had only one sort of money, the other bills were like the two-dollar bill I recovered." The effect of this testimony as to the identity of the money stolen and that described in the indictment is that the witness, who confesses that he does not know the different kinds of money, thinks that he had only one kind of money, and that the other bills were like the two-dollar bill, though he could not tell whether it was a currency, bank, or treasury note. Still he was of the opinion that he had only one kind of money, and this, although three of the notes are described as fractional currency of the United States, while the two-dollar one is a national currency bill. This character of evidence is, we think, too uncertain and indefinite to support the verdict, and does not warrant the conviction for the theft of twenty dollars as charged in the indictment.

The judgment is reversed and the case remanded.

REVERSED AND REMANDED.