<hr />

FORREST HUDSON *v.* THE STATE.

1. AN INDICTMENT is not vitiated by bad spelling.
2. INDICTMENT.— Motion in arrest of judgment because the indictment did not conclude "against the peace and dignity of the State" was founded upon the mis-spelling of the word "against",— the "i" and "n" being so transposed as to read "*aganist*." *Held*, that the court did not err in overruling the motion.
3. CHARGE OF THE COURT.— A charge must be taken and construed as a whole, and if as a whole it is correct, no detached portion, unless

in and of itself sufficient or calculated seriously to mislead, or
liable to grave misconstruction, will require a reversal of the case.

4. THEFT.— If the property alleged to have been stolen came into the
possession of the accused by lawful means, the subsequent appro-
priation of it is not theft; but, if the taking, though originally law-
ful, was obtained by any false pretext, or with intent to deprive
the owner of the value thereof, and appropriate the property to the
use and benefit of the person taking, and the same is so appro-
priated, the offense of theft is complete.

APPEAL from the District Court of Johnson. Tried
below before the Hon. J. ABBOTT.

The indictment charged the theft, from Philip Welsh,
of two horses, in Johnson county, on the 20th day of
September, 1879. Trial resulted in conviction, and five
years' confinement in the penitentiary was the penalty
assessed by the jury.

The substance of the testimony of Philip Welsh, the
first witness for the State, was that in September, 1879,
he was living with one Isaac Holloway, in Bosque county,
Texas, with whom he had a contract that may be stated
thus:    The witness owned two fine trotting horses.
Holloway was to furnish the witness board for himself
and feed for his horses, and he was to train them to trot,
and the two, Holloway and witness, were to take them
to the fall fairs and enter them for prizes, the proceeds, if
any accrued, to be equally divided. The approaching fair at
McKinney was one among the many to which the horses
were to be taken and entered. Just before getting ready
to start to the McKinney fair, Holloway decided that he
would not go, according to agreement, but would move
away, and said that he would take the best of the two
horses, and he forbade the witness taking that horse out
of the stable for training purposes, and commenced a
system of abuse of witness. At this juncture the wit-
ness appealed to several parties, Kinchloe among the num-
ber, to buy Holloway out and assume the contract upon

the same terms.  About the middle of September, 1879, the defendant, who was present at some of the disagreements of Holloway and witness, accosted witness at the stable and said to him, "Philip, you want a friend," and promised that if witness would trust him, he would manage the matter all right, adding, "if I don't, you may shoot me."  He told witness that Holloway was trying to get his horses; that if witness would make him, defendant, a bill of sale to the horses, he would go with witness to the fairs, trot the horses, and divide the profits.  Defendant also promised, by way of inducement, that he would pay Holloway what was due him, and leave the horses in the possession of witness.  The witness went to defendant's house one Thursday evening, and made him a bill of sale to the horses and buggy, which defendant tore up, saying it was not right, and on the following day he made another which was witnessed, at the request of defendant, by Campbell Worsham and Ham Worsham.  The object of the witness in executing the bill of sale was to get the defendant to pay Holloway, and thus keep him from taking his horse, and to enable him to attend the fairs and enter the animals.  The witness asserted his intention of paying Holloway as stipulated in his contract, as soon as the money could be made at the various fairs, and disclaimed having ever entertained a purpose to defraud him of his dues.

It was not understood between defendant and witness that this was a sale of the horses, but, on the contrary, that it was not, and that the latter was to retain possession of the animals.  The bill of sale was signed by the witness, who is a foreigner, because the defendant told him it was necessary in order to keep Holloway "off" of them until they could get to the fairs.  The last bill of sale was dated about September 16th.  The witness did not then deliver possession to defendant, but retained it himself.  On making the first bill of sale, defendant paid

witness $2.50 or $3.50 in silver, saying it was necessary to pass that to make the transaction "solid," the understanding at the time between them being that when they should go out of the house, witness was to give this money back to defendant; which he did. This money was paid in the presence of Ham Worsham, and was paid back to defendant by witness as soon as they stepped out of the house. At this time defendant told witness that he had a $100 Confederate bill that would have done for "this business" as well as any, but his wife being absent he could not find it.

On Friday after the execution of this last bill of sale, the witness drove his horses and buggy to defendant's house, and defendant got in the buggy and with witness drove across the Brazos river, around A. R. Welshe's house, near the Johnson county line, and from there down to the Elm-hollow,— a creek that runs into the Brazos. After going in that direction some distance they found the traveling rough and took the horses from the buggy; which defendant pushed into the brush, and the two took the horses down into a broken, brushy place in the hollow, where the defendant left witness and his horses. The witness remained in the brush all night. Next morning, about nine o'clock, Ham Worsham brought witness some bread and meat, and by him witness sent defendant word to come to him. About three o'clock on the same evening, the defendant and Ham Worsham came to the hollow where witness and his horses were. Defendant walked past witness without looking at him, and walked straight to where the horses were tethered. Witness followed, and defendant then told him that Holloway was "raising a mob" to hang witness. Witness answered that he had done nothing to be hung for; to which defendant replied that this was "Texas;" that "they didn't care a d—n for law in Texas," and unless witness let him have the horses Holloway would hang

him. Defendant further stated that he had a friend at Sandy Flat in Johnson county, to whom he would send witness on the following day, Sunday, and that he would follow Wednesday, bringing witness his horses, when they would proceed to the fair at McKinney. Witness contended that he was not to give up the horses, but defendant insisted that unless he did so for the time indicated he would be hung by Holloway and the mob. Under these assurances of danger and promises to return the horses at Sandy Flat on Wednesday, witness finally consented that defendant should take the horses for the time stated. Defendant and Ham Worsham then took the horses and left, and the latter returned late that evening with another team and some provisions. Witness and Worsham slept that night in the brush, and next day drove to Sandy Flat and stopped at a Mr. Beck's. Witness staid here two weeks, during which time he saw nothing of defendant, and has never seen his horses since.

At the end of two weeks the witness left Sandy Flat to hunt his horses, and found they had been carried into Montague county. The horses ı elonged to witness,— defendant had never paid him anything for them, except as stated.

The cross-examination failed to change the testimony of this witness. He stated, however, in addition to his testimony in chief, that no force was used to obtain possession of the animals,— he saw no weapons. He denied having told one Templeton, or other person, in Montague county, that while he was driving along the road the defendant and a boy, armed with pistols, made him get out of his buggy, and took the buggy and horses and drove off. Defendant's wife was not present when the bill of sale was signed, nor had he ever said in her presence or elsewhere that defendant had ever paid him, except in the manner stated, or that they were "even."

Wm. Kinchloe testified for the State that, sometime in

September, 1879, Philip Welsh came to him and asked him to buy of Holloway his interest in the two horses he was training to trot, and to assume Holloway's contract with him in regard to their exhibition at fairs. Witness declined, saying he was not the man to wrong any one, and Welsh answered that witness did not understand him,— he did not want to wrong Holloway, but wanted witness to take Holloway's place in the contract and divide profits with him, after buying Holloway out, as he was afraid of Holloway, who had misused him. Witness followed Holloway (who moved from Bosque county about the middle of September) across the Brazos river to Kimble, to pay him some money he owed. In Kimble, Bosque county, the defendant told witness that he had taken the horses into Montague county, and that he had paid Welsh $200 for them, and asked witness why Welsh did not come and take them if he claimed them as his.

Mark Crabtree testified for the State that after Holloway left Bosque county, but in the month of September, 1879, he saw defendant on Haley's Branch, Johnson county, driving one of Welsh's horses in his buggy.

Beck and Adams testified that Ham Worsham brought Welsh to Sandy Flat, about the middle of September, 1879, and that Welsh staid there some two or three weeks.

Ham Worsham, for the defense, testified substantially that, at the house of defendant, he was called on to witness a bill of sale from Welsh to defendant of the horses; that he saw defendant pay Welsh two or three dollars in silver, and heard him say on paying it, "that is the balance on that one hundred dollars," and heard Welsh say "yes." Next day Welsh asked witness' brother Campbell to sign the bill of sale as a witness, which he did with his mark, defendant writing the name. Defendant then said, "that makes it all right, don't it, Philip?" Welsh said "yes," and that he then delivered

to defendant the horse he was riding, but borrowed it to ride to Mr. Holloway's. After riding some distance towards Holloway's, Welsh galloped back to defendant and witness, and said that he had forgotten to include the harness in the bill of sale. Defendant said that it made no difference, and Welsh answered, "all right, it goes with the buggy anyway." The next day, when Holloway went to move, he told Welsh to tie his, Holloway's, sulky behind the buggy, and take it to Kimble. Welsh tied the sulky behind, and he and witness got in the buggy, and, instead of going to Kimble, went to witness' mother's house, where they met the defendant. Then Welsh said to defendant, "there's your buggy and horses." Defendant told him to untie the sulky, which he did. Welsh then asked witness to go to Kimble next day and tell Holloway where his sulky was. Witness did so. On Friday defendant told witness that he had sent Welsh to graze the horses, and, pointing in the direction of a field in which he had gone, asked witness to go and tell Welsh to bring the horses to the house. Witness crossed the large field in which the grazing was good, crossed the river into Elm Hollow, where the grazing was poor, and there found Welsh and the horses. He delivered defendant's message, but Welsh said he would not again cross the river, as he was afraid of Holloway, but told witness to tell defendant to come to him. Witness and defendant returned to Welsh, and then Welsh delivered the horses to defendant. No force was used; nothing was said by defendant to Welsh about a mob or about Holloway threatening to hang him. After assisting defendant in taking his horses home, witness returned to Welsh, as requested, with supper and breakfast, and staid all night with him in the brush, and, as requested by defendant, next morning took Welsh to Mr. Beck's at Sandy Flat. On the following Sunday witness returned to Sandy Flat, taking Welsh his cloth-

ing.   Witness denied having told Beck or others that defendant authorized him to say to Beck that he, defendant, would call for Welsh at Beck's on Wednesday, to take him to the McKinney fair.   He denied having told one Gibson at the Elm Hollow crossing, on September 20th, that he did not know where Welsh was, and that he "reckᴖned he had gone to h—ll."   Denied having told Gibson afterwards in Cleburne that on September 20th, when he met him at the Elm crossing, that in fact he did know where Welsh was, and that he had just left Welsh in Elm Hollow.

Campbell Worsham corroborated his brother in regard to his making his mark as a witness to the bill of sale, at Welsh's request, and testified that on that occasion he heard Welsh deliver to defendant the possession of the horse he was riding, but immediately borrowed him to ride home.

Defendant's wife, Clarinda Hudson, testified for the defense that about the middle of September, 1879, defendant, in her presence, paid Welsh a $100 greenback bill,— one that she had had for five years.   Witness was in Hill county at her brother's when her husband, the defendant, came for her, and told her that he had bought a buggy and horses, and wanted her to go home and get the $100 bill for him.   She went home, as requested, and got it out of the bed where she kept it.   In her presence, the defendant gave the bill to Welsh, and said, "that makes us even," and Welsh said "yes."   Witness heard defendant tell Welsh to take the horses out to graze.

On cross-examination witness said she could neither read nor write, and knew the bill to be a $100 greenback bill only by her husband's telling her so when he gave it to her five or six years before.

Wm. Templeton testified that between the 20th and last of November, 1879, at his home in Montague county, Welsh told him, in the presence of one James Putnam,

that he, Welsh, had started some time before to the McKinney fair, and while driving along the road he was stopped by defendant and a boy, who, with drawn pistols, made him get out of his buggy, when they got in and drove off with the horses and buggy.

The defendant attacked the general reputation of Welsh for truth and veracity, and two witnesses swore that it was bad.   The bill of sale was in evidence.

The State recalled Beck, who testified that when Ham Worsham left Welsh at his house at Sandy Flat he said to him that defendant told him to say to witness that he, defendant, would call for Welsh on Wednesday to take him to the McKinney fair.   Adams and Stewart testified to the same effect.

Thomas Gibson, also in rebuttal, testified that on 20th September he met Ham Worsham at the crossing of the Brazos near Elm Hollow, and asked him where Philip Welsh was.   That Worsham replied, "I don't know,— gone to h—ll, I suppose."   That afterwards, during the October term of the Johnson County District Court, he met the said Worsham in Cleburne, and that Worsham then told him that when he met him at the crossing on the 20th September and told him he did not know where Welsh was, he did in fact know, and had but a short time before left him in Elm Hollow.

The defense moved for a new trial, and also in arrest of judgment.   Both motions being overruled, an appeal was taken.

*De Berry & Smith* and *J. M. Hall,* for the appellant. The court erred in admitting the evidence of the witness Kinchloe, as to a conversation had between witness and Philip Welsh, several days before the offense charged in the indictment, and which could not have been a part of the *res gestæ,* and did not tend to prove the guilt or innocence of the defendant in any manner.   Appellant was not

present at this conversation, and the evidence as to him was certainly irrelevant and immaterial.

The evidence shows that the owner of the property executed to appellant a bill of sale to the two geldings described in the indictment, about 16th September, 1879. Welsh, the owner, says that appellant never paid him for the geldings, and that the object of the bill of sale was to get defendant to pay a man named Holloway what he, Welsh, owed him, and that the bill of sale was a sham. Without attempting to reconcile the statements of State's witnesses, it is to be observed that the evidence shows that the bill of sale was duly executed with all the formality of the law, and there is evidence to show that Welsh admitted the payment of the purchase money. This being the evidence, it is submitted that the first and tenth assignments are well taken, because the court instructed the jury that delivery of the possession of the animals was necessary to pass the title, when the court should have told the jury "when personal property is conveyed by bill of sale, it is not necessary to accompany the bill of sale with delivery of possession in order to pass title." In support of this proposition the following authorities are cited: *Griffin* v. *Chubb*, 7 Texas, 603; *McKinney* v. *Fort*, 10 Texas, 220; *McQuinnay* v. *Hitchcock*, 8 Texas, 35; *Van Hook* v. *Wallen*, 28 Texas, 73; *Hewett* v. *Holt*, 23 Texas, 61; Hilliard on Sales, 2d ed. 98; *Dyer* v. *Bean*, 15 Ark. 15.

The second assignment relates to the venue, and the effect of which is that the court failed to instruct the jury that in this case, if the geldings were brought into Johnson county before they were stolen in some other county, the offense could not be prosecuted in Johnson county, if the appellant brought or carried the geldings into that county before they were stolen, and at a time when they were not stolen property, and the jury should have been instructed that if they found defendant guilty of theft of

one of the geldings described in the indictment, in some other than Johnson county, and more than 400 yards from the Johnson county line, then the jury must believe from the evidence that appellant brought the gelding so stolen into, or carried the same through, Johnson county.

The third assignment of error is, in effect, that the court in his charge makes no distinction between a case of fraud of the vendor and vendee or both. Certainly the defendant could not be convicted for the fraud, either actual or constructive, of Welsh. The court should have instructed the jury that if the bill of sale was procured by the fraud and misrepresentation (not *or* misrepresentation, as the court below has it in the charge) of the defendant, such fraud and misrepresentation must have been practiced by defendant on Welsh, in order to constitute a criminal offense, though even then it would not have been theft. It is difficult to see how a mere misrepresentation, without any elements of fraud entering into it, can be considered as one of the constituents of "theft of geldings."

The fourth assignment of error is, that the court erred in 11th paragraph of his charge, because it does not present the law of this or any other case.

It is submitted that, if appellant induced Welsh to execute the bill of sale by fraudulent representations or false pretense, then the offense would be swindling, not theft.

It is true our statute makes theft in general include swindling, but swindling does not include theft.

Neither does theft in general include horse stealing; the punishment for the former is not less than two nor more than ten years in the penitentiary, of the latter not less than five nor more than fifteen years' confinement in the penitentiary.

It is submitted that any fraudulent representation or false pretense which causes one to part with his title is .

swindling and not theft of horses,— the latter being a specific offense.

There is no such specific offense as swindling one out of his gelding, with a specific penalty. The facts show in this case that if the defendant is guilty at all he is guilty of swindling, and that offense should be given in charge to the jury when he is tried under a proper indictment. The appellant is entitled to have a jury say whether they will give him not less that two nor more than ten years in the penitentiary. The jury, it is to be observed, gave appellant the minimum penalty for horse stealing. *Parchman* v. *State*, 2 Texas Ct. App. 228.

The fifth assignment of errors shows that the court did not instruct the jury as to the kind of appropriation necessary to make this a case of theft; and from the charge of the court the jury might well have inferred that the act of acquiring lawful possession of the geldings was an appropriation of them. The appropriation in a case of this kind must be subsequent to the lawful acquisition of property, and must be distinctly proved, and cannot be inferred from the possession or the act of getting possession of the property. *Berg* v. *State*, 2 Texas Ct. App. 150.

The twenty-first and twenty-second assignments of errors are, in substance, that the court erred in failing to charge the jury as to the difference between theft and swindling.

The facts show the defendant guilty of swindling, if anything, and he could not be convicted of that offense under the present indictment for theft of geldings. The law requires the trial judge to charge the jury on the law applicable to the facts of each case. Certainly a charge intended to cover a charge of theft of geldings does not fit the facts of this case. If this conviction should stand appellant might, under the same charge, be convicted of theft of geldings though the facts in evidence disclosed a case of murder in the first degree.

Theft is a distinct offense.   Penal Code, art. 735.

Theft of geldings is a distinct offense.   Penal Code, art. 746.

Theft under art. 735 above does not apply to theft under 737.

Theft may include swindling and embezzlement, etc., but this does not mean that theft of geldings shall include these offenses, because the penalty is different.   If this were otherwise, then there would be two different punishments prescribed by our statute for the same offense (swindling); 1st, not less than two and not more than ten years; 2d, not less than five nor more than fifteen years. So this will not do.

If the facts show this case to be swindling, then the law for that offense should have been given to the jury. *Simco* v. *State*, 8 Texas Ct. App. 407; *Jones* v. *State*, 7 Texas Ct. App. 338; *Powell* v. *State*, 7 Texas Ct. App. 467.

*Horace Chilton*, Assistant Attorney General, for the State.

WHITE, P. J.   The offense of which appellant was indicted was the theft of two geldings, the property of Philip Welsh, and it was alleged to have been committed on the 20th day of September, 1879, in Johnson county, Texas.   Upon trial and conviction his punishment was assessed at five years' imprisonment in the penitentiary.

Objection to the indictment is made in the motion in arrest that it does not conclude "against the peace and dignity of the State."   The objection refers alone to the spelling of the word "against," in which the letters "i" and "n" are transposed, so as to make the word spell as written "*aganist*."   The case of *Cox* v. *State*, 8 Texas Ct. App. 254, is not analogous.   In that case the word was not mis-spelled; the trouble was that it was not only spelled correctly, but so correctly spelled that there could be no mistake about it or about the fact that it was a

complete and perfect substitution of another and entirely
different word for the one which both the Constitution
and the law declared was essential to the sufficiency and
validity of the indictment. The word "aganist" is evi-
dently a mis-spelling of the proper word.

"Bad spelling does not vitiate an indictment if the
meaning is unmistakable. *State* v. *Earp*, 41 Texas, 487;
*Thomas* v. *State*, 2 Texas Ct. App. 293; *Stinson* v. *State*,
5 Texas Ct. App. 31. Nor bad handwriting. *State* v.
*Morris*, 43 Texas, 372; *Irvin* v. *State*, 7 Texas Ct. App.
109. Nor bad grammar. *Gay* v. *State*, 2 Texas Ct. App.
127. Nor tautology and repetition. *State* v. *Richardson*,
2 Texas Ct. App. 322. Nor when the month is written
'Teburary' instead of February. *Witten* v. *State*, 4
Texas Ct. App. 70. Nor 'Janury' instead of January.
*Hutto* v. *State*, 7 Texas Ct. App. 44. Nor 'eiget' for
eight. *Somerville* v. *State*, 6 Texas Ct. App. 433. Nor
'possion' for possession. *State* v. *Williamson*, 43 Texas,
500." Clark's Crim. Laws of Texas, pp. 421–2 (notes).

The court did not err in overruling the motion in arrest
of judgment.

We do not propose to discuss in detail all the errors
complained of with regard to the admission of evidence
claimed to be irrelevant and illegal, or the objections so
strenuously urged to certain portions of the charge of the
court, as to their sufficiency and correctness as proposi-
tions of law applicable to the facts in the case. In the
view we take of the case it would be a useless consump-
tion of time. Besides, most of the questions raised have
been settled by previous adjudications of the courts of
our State. We propose to address ourselves mainly to
what in our opinion constitute the real questions in the
case, and no others. We may remark, however, gener-
ally with regard to the evidence claimed to be inadmissi-
ble, as set forth in defendant's eight bills of exceptions,
that the explanations given by the judge as reasons for

his action are entirely satisfactory under the law and facts of the case.

Many objections are urged to the charge of the court, and detached portions and paragraphs are separated and made the subject of comment and criticism in the brief of counsel for appellant. It is a rule well settled that a charge should be taken and construed as a whole, and if as a whole it is correct, no detached portion, unless in and of itself sufficient or calculated seriously to mislead or be liable to grave misconstruction, will render necessary a reversal of the case. Taken as a whole, the charge before us is a fair and able exposition of the law with relation to the facts.

But it is urgently insisted that the facts develop a case of swindling and not of theft, and that the court erred in not submitting the question of swindling, inasmuch as the punishment for the latter offense is less than that of theft; and that appellant was entitled to have the jury say whether or not they would give him not less than two nor more than ten years in the penitentiary, instead of being limited to not less than five nor more than fifteen, which is the punishment for horse-stealing.

In preparing their argument in support of the proposition that the offense as proven was swindling and none other, counsel seem to have overlooked a most important statutory provision which appears to us to cover the very facts adduced on the trial. The statute provides, with regard to theft, that "the taking must be wrongful, so that if the property came into the possession of the person accused of theft, by lawful means, the subsequent appropriation of it is not theft; but if the taking, though originally lawful, was obtained by any false pretext, or with any intent to deprive the owner of the value thereof and appropriate the property to the use and benefit of the person taking, and the same is so appropriated, the offense of theft is complete." Penal Code, art. 748. This is what

the court expressly charged the jury in the 14th subdivision of the charge. The charge is in strict conformity with law and precedent. See *Dignowitty* v. *State*, 17 Texas, 521; *Maddox* v. *State*, 41 Texas, 205; 3 Greenl. Ev. § 160; *Quitzow* v. *State*, 1 Texas Ct. App. 65; 1 Bish. Cr. L. sec. 1017; 43 Texas, 494; 5 Texas Ct. App. 123.

The evidence is ample to establish both the crime and its venue as laid in the indictment.

A careful examination of the record satisfies us that no error has been committed on the trial which requires of us a reversal of the judgment of conviction; and it is consequently affirmed.

*Affirmed.*